**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| MARTHA'S VINEYARD AIRPORT COMMISSION, | ) | C/A No. 2:20-cv-1761-RMG |
| *Plaintiff,* | ) ) | |
| *-vs -* | ) ) | **COMPLAINT** |
| 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., AMEREX CORPORATION, TYCO FIRE PRODUCTS L.P., CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, KIDDE-FENWAL, INC.; NATIONAL FOAM, INC., ANGUS INTERNATIONAL SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, FIRE SERVICE PLUS, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., RAYTHEON TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., ARCHROMA U.S., INC., ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a Asahi Glass Co. Ltd., AGC CHEMICALS AMERICAS INC., CHEMDESIGN PRODUCTS INC., CHEMICALS, INC., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DEEPWATER CHEMICALS, INC., E.I. DU PONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, L.L.C., individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DUPONT DE NEMOURS INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise, DYNAX CORPORATION, DYNEON LLC, THE ELE CORPORATION, BASF CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., NARCHEM CORPORATION, NATION FORD | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Jury Trial Demanded** |

CHEMICAL COMPANY, CLARIANT CORPORATION,        )
and JOHN DOE DEFENDANTS 1-49,

*Defendants.*

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................5

II.   JURISDICTION AND VENUE.............................................................................8

III.  PARTIES ................................................................................................................9
      A.    Plaintiff..........................................................................................................9
      B.    Defendants .....................................................................................................9
            i.     The AFFF Defendants..........................................................................9
            ii.    The Fluorosurfactant Defendants....................................................... 14
            iii.   The PFC Defendants ........................................................................... 19

IV.   FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION ........ 24
      A.    PFOA and PFOS and Their Risk to Public Health ........................................ 24
      B.    Defendants' Manufacture and Sale of AFFF/Component Products.............. 25
      C.    Defendants' Knowledge of the Threats to Public Health and the Environment
            Posed by PFOS and PFOA ........................................................................... 27
            i.     1940s and 1950s: Early Warnings About the Persistence of AFFF.......... 27
            ii.    1960s: AFFF's Environmental Hazards Come Into Focus ...................... 29
            iii.   1970s: Internal Studies Provide Evidence of Environmental and Health
                   Risks................................................................................................. 29
            iv.    1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount
                   ......................................................................................................... 32
            v.     Defendants Hid What They Knew from the Government and the Public  34
      D.    The Impact of PFOS and PFOA on the Environment and Human Health Is
            Finally Revealed ........................................................................................... 35
      E.    AFFF Containing PFOS and PFOA is Fungible and Commingled in the
            Groundwater ................................................................................................. 40
      F.    Market Share Liability, Alternative Liability, Concert of Action, Enterprise
            Liability ........................................................................................................ 41

V.    CAUSES OF ACTION ......................................................................................... 42
      COUNT I:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
                DEFECTIVE DESIGN ..................................................................... 42

      COUNT II:  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
                 FAILURE TO WARN ..................................................................... 44

      COUNT III:  NEGLIGENCE .............................................................................. 46

      COUNT IV:  TRESPASS .................................................................................... 48

**COUNT V:  MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY** ............................................... 49

**COUNT VI:  ACTUAL FRAUDULENT TRANSFER (DuPont and Chemours Co.)** .................................................................................. 50

**COUNT VII:  CONSTRUCTIVE FRAUDULENT TRANSFER (DuPont and Chemours Co.)** .................................................................................. 50

**COUNT VIII:  PUNITIVE DAMAGES** .................................................................. 51

**PRAYER FOR RELIEF** ........................................................................................ 52

**DEMAND FOR JURY TRIAL** ............................................................................. 53

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the MARTHA'S VINEYARD AIRPORT COMMISSION ("MVAC"), by and through its undersigned counsel, hereby files this Complaint and alleges as follows:

## I.    INTRODUCTION

1.    This action arises from the foreseeable contamination of groundwater by the use of aqueous film-forming foam ("AFFF") products that contained per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2.    PFOS and PFOA are fluorosurfactants that repel oil, grease, and water.  PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires.  Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

3.    PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

4.    At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS. PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") contained in AFFF (collectively, "AFFF/Component Products").

5.    Defendants designed, manufactured, marketed, distributed, and/or sold AFFF/Component Products with the knowledge that these toxic compounds would be released into the environment during fire protection, training, and response activities, even when used as directed and intended by Defendants.

6.    Since its creation in the 1960s, AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants, and/or that contained fluorosurfactants and/or PFCs designed, manufactured, marketed, distributed, and/or sold by Defendants, was sold to municipal airports, such as the Martha's Vineyard Airport ("MVY"), used as directed and intended by Defendants, and subsequently released into the environment during fire protection, training, and response activities, resulting in widespread PFAS contamination.

7.    In November 2018, sampling of private wells located south of MVY identified concentrations of PFAS above the Massachusetts Department of Environmental Protection ("MassDEP") Office of Research and Standards Guideline ("ORSG") concentrations and at concentrations that necessitated reporting to MassDEP as a potential Imminent Hazard ("IH").

8.    To perform the necessary PFAS sampling and remediation efforts, MVAC contracted with Tetra Tech, a provider of management consulting, environmental remediation, and design engineering.

9.    On November 20, 2018, MassDEP was notified of this condition and Release Tracking Number ("RTN") 4-0027571 was assigned to the PFAS release at MVY.  At that time, MVAC and Tetra Tech initiated Immediate Response Action ("IRA") activities that had been orally-approved by MassDEP. These activities included providing bottled water to impacted residents, installing point-of-entry treatment systems ("POET"), and performing an extensive private well sampling and public notification program within the potentially-impacted area. The

activities also included provisions for managing potential PFAS-impacted soils as part of a runway project.

10.     On January 18, 2019, a written IRA plan was submitted to MassDEP.

11.     On February 7, 2019, MassDEP issued a Conditional Approval and interim deadline to provide a full status of assessment and remedial actions.

12.     IRA Status Reports were submitted to MassDEP monthly from February 2019 through July 2019.[1]

13.     In July 2019, MassDEP requested semi-annual IRA Status Reports.

14.     On December 18, 2019, MassDEP received the IRA Status Report #7, the first, and the most recent, semi-annual IRA Status Report.

15.     On December 27, 2019, MassDEP adopted a current and potential drinking water source area PFAS standard at 20 parts per trillion (ppt) for the sum of 5 PFAS compounds (PFDA, PFHpA, PFHxS, PFOA, and PFOS) as well as PFNA (perfluorononanoic acid).

16.     Pursuant to the IRA activities mentioned above, a total of 193 private wells have been sampled to date, including 190 private wells at downgradient properties ("Affected Areas") and 3 private wells at MVY. PFAS were detected in 84 of the 193 private wells sampled. The detected concentrations of the target 5 PFAS ranged from 1.80 ppt to 1,762 ppt.

17.     To date, a total of 41 POET systems have been installed.

18.     The POET systems are comprised of vessels with 55 pounds of granular activated carbon ("GAC"), a cartridge filter, and a flow totalizer.

19.     The POET systems installed at locations where concentrations of the sum of the 5 target PFAS exceeded 70 ppt included two GAC units connected in series.  The POET systems

---

[1] All IRA Status Reports are available at https://mvyairport.com/.

installed at locations where the concentrations of the sum of the 5 target PFAS were less than 70 ppt include one GAC unit.

20.    All of the abovementioned GAC units undergo quarterly or semi-annual monitoring/testing.  Plaintiff, MVAC, will be forced to incur costs relating to such PFAS monitoring/testing for at least the next 50 years that they otherwise would not have to incur.

21.    The spent GAC is being temporarily stored at MVY in a storage shed at an onsite wastewater treatment plant pending off-site disposal.

22.    As the investigation continues, it is anticipated that further contamination from storage, handling, use, training with, testing equipment with, other discharges, and disposal of Defendants' AFFF products may be uncovered.  Accordingly, the Affected Area may expand.

23.    Plaintiff, MVAC, brings this action to recover damages it either has incurred or will incur in investigating, monitoring, remediating, and otherwise responding to the PFAS contamination to stem the threat to public health and the environment caused by Defendants' AFFF/Component Products.

## II.    JURISDICTION AND VENUE

24.    Pursuant to this Court's Case Management Order No. 3, this Complaint is filed as an original action in the United States District Court for the District of South Carolina.

25.    This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1332(a), in that this action seeks monetary relief in excess of the sum or value of $ 75,000, exclusive of interest, and there is complete diversity between the parties.

26.    Plaintiff, MVAC, is a county airport commission established under Massachusetts state law, and has exclusive custody, care and management of MVY, which is located in Dukes County, Massachusetts.

27.    Pursuant to 28 U.S.C. § 1391, Plaintiff's Home Venue is the United States District Court for the District of Massachusetts.

28.    This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with Massachusetts, including, among other things, purposefully marketing, selling and/or distributing their AFFF/Component Products to and within Massachusetts, and because they have the requisite minimum contacts with Massachusetts necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

## III.    PARTIES

### A.    Plaintiff

29.    Plaintiff, MVAC, brings this action representative of itself as the operator of MVY, which includes the premises described herein, and as a result of the widespread PFAS contamination described above.

30.    MVY is comprised of two separate parcels of land in West Tisbury and Edgartown, Massachusetts: a 410-acre parcel of land identified as 71 Airport Road in West Tisbury, Massachusetts and a separate 385-acre parcel of land identified as 9 Airport Road in Edgartown, Massachusetts.

### B.    Defendants

31.    The term "Defendants" refers to all Defendants named herein jointly and severally.

#### i.    The AFFF Defendants

32.    The term **"AFFF Defendants"** refers collectively to Defendants 3M Company, Buckeye Fire Equipment Company, Chemguard Inc., Tyco Fire Products L.P., National Foam, Inc., Angus International Safety Group, Ltd., Angus Fire Armour Corporation, Amerex Corporation, Kidde-Fenwal, Inc., Kidde P.L.C., Inc., UTC Fire & Security Americas Corporation,

Inc., Raytheon Technologies Corporation, Chubb Fire Ltd., and Fire Service Plus, Inc.

33.     Defendant **3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

34.     Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

35.     **Defendant Amerex Corporation ("Amerex")** is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

36.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

37.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

38.     On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

39.     **Defendant Tyco Fire Products LP ("Tyco")** is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

40.     On information and belief, Tyco is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

10

41.    Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

42.    Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

43.    After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

44.    **Defendant Chemguard, Inc. ("Chemguard")** is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

45.    On information and belief, Chemguard is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

46.    On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

47.    **Defendant Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

48.    On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

49.    **Defendant National Foam, Inc. ("National Foam")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

50.     Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

51.     On information and belief, National Foam currently manufactures the Angus brand of AFFF products and is a subsidiary of Angus International Safety Group.

52.     **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. On information and belief, Chubb is registered in the United Kingdom with a registered number of 134210.

53.     On information and belief, Chubb merged with National Foam to form Chubb National Foam, Inc. in or around 1988.

54.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

55.     On information and belief, Chubb was acquired by Williams Holdings in 1997.

56.     **Defendant Angus Fire Armour Corporation ("Angus Fire")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 141 Junny Road, Angier, North Carolina 27501.

57.     On information and belief, Angus Fire was acquired by Williams Holdings in 1994.

58.     On information and belief, Angus Fire is currently a subsidiary of Angus International Safety Group, Ltd.

59.     **Defendant Kidde P.L.C., Inc. ("Kidde P.L.C.")** is a foreign corporation organized and existing under the laws of Delaware, with its principal place of business at One Carrier Place, Farmington, Connecticut 06034.

60.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

61.     **Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal")** is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

62.     On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

63.     **Defendant Raytheon Technologies Corporation ("Raytheon Technologies")** is a foreign corporation organized and existing under the laws of Delaware, with its principal place of business at 10 Farm Springs Road, Farmington, Connecticut 06032.

64.     On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

65.     On information and belief, Kidde-Fenwal, Inc. became part of the UTC Control & Security unit of United Technologies Corporation.

66.     On information and belief, United Technologies Corporation merged with Raytheon Company to form Raytheon Technologies in or around April 2020.

67.     **Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC Fire")** is a corporation organized and existing under the laws of North Carolina, with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

68.     On information and belief, UTC Fire was created when United Technologies Corporation acquired Kidde P.L.C. and combined it with Chubb in or around 2005.

69.     On information and belief, UTC Fire became a subsidiary of Raytheon Technologies when United Technologies Corporation merged with Raytheon Company in April 2020.

70.     **Defendant Angus International Safety Group, Ltd.** is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancanster, United Kingdom LA2 7NA.  On information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

71.     On information and belief, Angus International Safety Group was formed when Angus Fire and National Foam separated from United Technologies Corporation in or around 2013.

72.     **Defendant Fire Service Plus, Inc. ("Fire Service Plus")** is a corporation organized under the laws of the State of Georgia, with its principal place of business located at 180 Etowah Trace, Fayetteville, GA 30214.

73.     On information and belief, Fire Service Plus designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

74.     On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and sold AFFF products containing PFOS, PFOA, and/or their chemical precursors that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at MVY.

ii.     The Fluorosurfactant Defendants

75.     The term **"Fluorosurfactant Defendants"** refers collectively to Defendants 3M Company, Arkema France, S.A., Arkema Inc., BASF Corporation, ChemDesign Products Incorporated, Chemguard Inc., Corteva, Inc., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours

Inc., Dynax Corporation, and Dyneon LLC.

76.    On information and belief, 3M Company designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in their AFFF products and other entities' AFFF products.

77.    **Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

78.    Arkema Inc. develops specialty chemicals and polymers.

79.    Arkema, Inc. is an operating subsidiary of Defendant Arkema France, S.A.

80.    **Arkema France S.A. ("Arkema France")** is a publicly-traded foreign corporation with its principal place of business in Colombes, France.  Arkema France S.A. is the parent corporation of Arkema Inc.

81.    Arkema France and Arkema Inc. are collectively referred to as "Arkema."

82.    On information and belief, Arkema designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

83.    **Defendant BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

84.    On information and belief, BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

85.    On information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

86.    **Defendant ChemDesign Products Inc. ("ChemDesign")** is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

87.    On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products

88.    **Defendant Deepwater Chemicals, Inc. ("Deepwater")** is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

89.    On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

90.    **Defendant Dynax Corporation ("Dynax")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

91.    On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

92.    On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

93.    **Defendant Dyneon, LLC ("Dyneon")** is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 6744 33rd Street

N, Oakdale, Minnesota 55128.

94.     On information and belief, Dyneon was created in 1996 by 3M and Hoechst AG as a joint venture fluoropolymer business.

95.     On information and belief, Dyneon became a wholly-owned subsidiary of 3M after the latter agreed to buy out Hoechst AG's minority stake in 1999.

96.     On information and belief, Dyneon designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

97.     **Defendant E.I. du Pont de Nemours & Company ("DuPont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

98.     **Defendant The Chemours Company ("Chemours Co.")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.

99.     In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFOS and PFOA and fluorosurfactants.  On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors to manufacturers of AFFF products.

100.    On information and belief, Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015.  From that time until July 2015, Chemours Co. was a wholly-owned subsidiary of DuPont.

101.    In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its

"performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly-traded company.

102. **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899.

103. **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

104. **Defendant Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

105. On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

106. Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

107. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

108. Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

109.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

110.    Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

111.    On information and belief, DuPont designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

112.    On information and belief, Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

113.    On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at MVY.

iii.    The PFC Defendants

114.    The term **"PFC Defendants"** refers collectively to 3M, AGC, Inc., AGC Chemicals Americas Inc., Archroma U.S., Inc., ChemDesign Products Inc., Chemicals, Inc., Clariant Corporation, Daikin America, Inc., Daikin Industries Ltd., Deepwater Chemicals, Inc., E.I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., DuPont de Nemours Inc., The Elé Corporation, Narchem Corporation, Nation

Ford Chemical Company, and Solvay Special Polymers USA LLC.

115.    **Defendant AGC, Inc. f/k/a Asahi Glass Co. Ltd.** is a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

116.    **Defendant AGC Chemicals Americas, Inc.** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

117.    On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc.

118.    AGC, Inc. and AGC Chemicals Americas, Inc. are collectively referred to herein as "AGC."

119.    AGC manufactures specialty chemicals.  It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

120.    On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

121.    **Defendant Archroma U.S., Inc. ("Archroma")** is a corporation organized and existing under the laws of Delaware, with its a principal place of business at 543577 Center Drive., Ste. 10, Charlotte, NC 28217-0750.

122.    On information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management LLC, a foreign corporation based in Reinach, Switzerland.  Archroma U.S., Inc. and Archroma Management LLC are collectively referred to as "Archroma" throughout this Complaint.

123.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

124.    On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

125.    **Defendant Chemicals, Inc. ("Chemicals, Inc.")** is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

126.    On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

127.    **Defendant Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

128.    On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz").  On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

129.    On information and belief, Clariant supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

130.    **Defendant Daikin Industries, Ltd.** is a corporation organized under the laws of Japan, having its principal place of business in Osaka, Japan.

131. **Defendant Daikin America, Inc.** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

132. On information and belief, Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd.

133. Daikin Industries, Ltd. and Daikin America, Inc. are collectively referred to herein as "Daikin."

134. Daikin is a developer and manufacturer of fluorochemical products, including fluoropolymers, fluoroelastomers, and fluorocarbon gas.

135. On information and belief, Daikin supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

136. **Defendant Elé Corporation ("Elé Corporation")** is a corporation organized and existing under the laws of Illinois, with its principal place of business located at 7847 West 47th Street, McCook, Illinois 60525.

137. On information and belief, Elé Corporation supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

138. **Defendant Narchem Corporation ("Narchem")** is a corporation organized and existing under the laws of Illinois, with its principal place of business located at 2519 Pan AM Blvd, Elk Grove Village, IL 60007.

139. On information and belief, Narchem supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

140.    **Defendant Nation Ford Chemical Co. ("Nation Ford")** is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

141.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

142.    **Defendant Solvay Specialty Polymers, USA, LLC ("Solvay")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 4500 McGinnis Ferry Road, Alpharetta, GA 30005.

143.    On information and belief, Solvay supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

144.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

145.    On information and belief, the Fluorochemical Defendants supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at MVY.

146.    Upon information and belief, Defendant John Does 1-49 were manufacturers and/or distributors of AFFF/Component Products.  Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time Plaintiff will move for leave of this Court to add those Defendants' actual names to the Complaint.

147.    Defendants represent all or substantially all of the market for AFFF/Component Products at MVY.

## IV.    FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A.    PFOA and PFOS and Their Risk to Public Health

148.    PFAS are chemical compounds containing fluorine and carbon.  These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water.  These substances are not naturally occurring and must be manufactured.

149.    The two most widely studied types of these substances are PFOA and PFOS.

150.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

151.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

152.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

153.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when

the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

154.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

155.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

156.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

157.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

158.    PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

**B.    Defendants' Manufacture and Sale of AFFF/Component Products**

159.    AFFF is a type of water-based foam that was first developed in the 1960s to extinguish hydrocarbon fuel-based fires.

160.    AFFF is a Class-B firefighting foam. It is mixed with water and used to extinguish fires that are difficult to fight, particularly those that involve petroleum or other flammable liquids.

161.    AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel. This film provides fire extinguishment and is the source of the designation aqueous film-forming foam.

162.     Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

163.     AFFF can be made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals.  Fluorine-free firefighting foams, for instance, do not release PFOA, PFOS, and/or their precursor chemicals into the environment.

164.     AFFF that contains fluorosurfactants, however, is better at extinguishing hydrocarbon fuel-based fires due to their surface-tension lowering properties, essentially smothering the fire and starving it of oxygen.

165.     The fluorosurfactants used in 3M's AFFF products were manufactured by 3M's patented process of electrochemical fluorination ("ECF").

166.     The fluorosurfactants used in other AFFF products sold by the AFFF Defendants were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

167.     The PFCs the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors and were designed, manufactured, marketed, distributed and/or sold by the PFC Defendants.

168.     On information and belief, the PFC and Fluorosurfactant Defendants were aware that the PFCs and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

169.     On information and belief, the PFC and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the PFC and/or fluorosurfactants contained in the

26

AFFF products discharged into the environment at MVY during fire protection, training, and response activities, resulting in widespread PFAS contamination.

170.    On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment at MVY during fire protection, training, and response activities, resulting in widespread PFAS contamination.

**C.    Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFOS and PFOA**

171.    On information and belief, by at least the 1970s 3M and DuPont knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

172.    On information and belief, 3M and DuPont concealed from the public and government agencies its knowledge of the threats to public health and the environment posed by PFOA and PFOS.

173.    Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

i.    1940s and 1950s: Early Warnings About the Persistence of AFFF

174.    In 1947, 3M started its fluorochemical program, and within four years, it began selling its PFOA to DuPont.  The persistence and contaminating nature of the fluorosurfactants contained in AFFF products were understood prior to their commercial application at 3M's Cottage Grove facility in Minnesota.

175.     The inventor of 3M's ECF process was J.H. Simons.  Simons' 1948 patent for the ECF process reported that PFCs are "non-corrosive, and of little chemical reactivity," and "do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures."[2]

176.     Simons further reported that fluorosurfactants produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule.    3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[3]

177.     The thermal stability of 3M's fluorosurfactants was also understood prior to commercial production.  Simons' patent application further discloses that the fluorosurfactants produced by the ECF process were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded the understanding of the thermal stability of perfluorocarbon compounds.[4]

178.     Nowhere in any Material Safety Data Sheet for any of Defendants' AFFF/Component Products is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFCs and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's ingredients are when released to unprotected water sources and even treatment plants.

---

[2] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

[3] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

[4] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

ii.    1960s: AFFF's Environmental Hazards Come Into Focus

179.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

180.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[5]  Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soils and groundwater.

181.    3M also knew by 1964 that when dissolved, fluorocarbon carboxylic acids and fluorocarbon sulfonic acids dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions.  Later studies by 3M on the adsorption and mobility of FC-95 and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[6]

iii.    1970s: Internal Studies Provide Evidence of Environmental and Health Risks

182.    By 1950, 3M knew that the fluorosurfactants used in its AFFF product(s) would not degrade when released to the environment, but would remain intact and persist.  Two decades later—and after the establishment of a robust market of AFFFs using fluorosurfactants—3M finally got around to looking at the environmental risks that fluorosurfactants posed.

---

[5] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[6] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

183.     An internal memo from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[7]  Hence, 3M understood at the very least that the fluorosurfactant used in its AFFF products would, in essence, never degrade once it was released into the environment.

184.     By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFCs.   A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[8]

185.     In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[9]  Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."  Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

186.     A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFCs is "likely to persist in the environment for extended period

---

[7] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

[8] Technical Report Summary, August 12, 1976 [3MA01252037].

[9] Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

unaltered by metabolic attack."[10]  A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[11]

187.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[12]  More than a decade after 3M began selling AFFF containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals."  The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"

188.    During the 1970s, 3M also learned that the fluorosurfactants used in AFFF accumulated in the human body and were "even more toxic" than previously believed.

189.    In 1975, 3M learned that PFAS was present in the blood of the general population.[13] Since PFOA and PFOS are not naturally occurring, this finding should have alerted 3M to the possibility that their products were a source of this PFOS.  The finding also should have alerted 3M to the possibility that PFOS might be mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics could explain how PFOS from 3M's products ended up in human blood.

---

[10] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

[11] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf.

[12] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[13] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

2:20-cv-01761-RMG    Date Filed 05/05/20    Entry Number 1    Page 32 of 53

190.    In 1976, 3M found PFAS in the blood of its workers at levels "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[14]  This finding should have alerted 3M to the same issues raised by the prior year's findings.

191.    Studies by 3M in 1978 showed that PFOA reduced the survival rate of fathead minnow fish eggs,[15] that PFOS was toxic to monkeys,[16] and that PFOS and PFOA were toxic to rats.[17]  In the study involving monkeys and PFOS, all of the monkeys died within days of ingesting food contaminated with PFOS.

192.    In 1979, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify the EPA of the finding.[18]

     iv.    <u>1980s and 1990s: Evidence of AFFF's Health Risks Continues to Mount</u>

193.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was

---

[14] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

[15] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[16] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf.

[17] Acute Oral Toxicity ($LD_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

[18] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

194.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[19]

195.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[20] That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[21] This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[22]

196.    In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[23]

---

[19] C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

[20] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[21] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[22] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPon, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

[23] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

197. A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

v.    Defendants Hid What They Knew from the Government and the Public.

198. Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e)

199. In April 2006, 3M agreed to pay EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFOS, PFOA, and other PFCs dating back decades.

200. Likewise, in December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

201. On information and belief, Defendants knew or should have known that AFFF containing PFOA or PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

202. Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/Component Products on the quality of unprotected water sources.

203. Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/Component Products. They understood far

more about the properties of their AFFF/Component Products—including the potential hazards they posed to human health and the environment—than any of their customers. Still, Defendants declined to use their sophistication and knowledge to design safer products.

### D. The Impact of PFOS and PFOA on the Environment and Human Health Is Finally Revealed

204.    As discussed above, neither 3M, DuPont, nor, on information and belief, any other Defendant complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/Component Products. *See* TSCA § 8(e).

205.    Despite decades of research, 3M first shared its concerns with EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee.[24]

206.    On information and belief, 3M began in 2000 to phase out its production of products that contained PFOS and PFOA in response to pressure from the EPA.

207.    Once the truth about PFOS and PFOA was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

208.    The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer,

---

[24] Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

209.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

210.    The injuries caused by PFAS can arise months or years after exposure.

211.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

212.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

213.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or

risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

214.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[25]

215.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[26]

216.    On May 25, 2016, the EPA released a lifetime health advisory (HAs) and health effects support documents for PFOS and PFOA.[27]   The EPA developed the HAs to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAs identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt. The HAs were based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and were also informed by epidemiological studies of human

---

[25] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

[26] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[27] *Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate*, Fed. Reg., Vol. 81, No. 101, May 25, 2016,.

populations exposed to PFOS. These studies indicate that exposure to PFOS and PFOA over these levels may result in adverse health effects, including:

a. Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

b. Cancer (testicular and kidney);

c. Liver effects (tissue damage);

d. Immune effects (e.g., antibody production and immunity);

e. Thyroid disease and other effects (e.g., cholesterol changes).

217.    In addition, PFOS and PFOA are hazardous materials because they pose a "present or potential threat to human health."[28]

218.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[29]

219.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been

---

[28] *Id.*; *see also National Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 3, 6 (D.C. Cir. 2015) (referring to PFOS as a "toxic compound" and a "hazardous chemical.").

[29] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[30]

220.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[31]

221.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 Million to remediate PFC contamination from military bases, as well as devoting $7 Million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[32]  The legislation also required that the Department of Defense submit a report on the status of developing a new military specification for AFFF that did not contain PFOS or PFOA.[33]

222.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[34]

---

[30] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[31] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

[32] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[33] *Id.*; *see also* U.S. Department of Defense, *Alternatives to Aqueous Film Forming Foam Report to Congress*, June 2018, *available at* https://www.denix.osd.mil/derp/home/documents/alternatives-to-aqueous-film-forming-foam-report-to-congress/.

[34] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

223.    On December 27, 2019, MassDEP adopted a current and potential drinking water source area PFAS standard at 20 parts per trillion (ppt) for the sum of 5 PFAS compounds (PFDA, PFHpA, PFHxS, PFOA, and PFOS) as well as PFNA (perfluorononanoic acid).

224.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[35]  Following a public comment period on its proposed decision, the EPA will decide whether to move forward with the process of establishing a national primary drinking water regulation for PFOA and PFOS.

**E.     AFFF Containing PFOS and PFOA is Fungible and Commingled in the Groundwater**

225.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

226.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, can originate from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

227.    Because precise identification of the specific manufacturer of any given AFFF/Component Product that was a source of the PFAS found at MVY and/or the Affected Area is nearly impossible, given certain exceptions, Plaintiff must pursue all Defendants, jointly and severally.

---

[35] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

228.     Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/Component Products containing PFOS and PFOA, at Plaintiff's expense, and to attempt to avoid liability.

**F.     Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability**

229.     Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors in the United States and are jointly responsible for the use of AFFF at MVY.  Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/Component Products at issue in this Complaint.  PFOS, PFOA, and/or their chemical precursors are fungible; it is nearly impossible to identify the exact Defendant who manufactured any given AFFF/Component Product containing PFOS, PFOA, and/or their chemical precursors found free in the air, soil or groundwater, and each of these Defendants participated in a territory-wide and U.S. national market for AFFF/Component Products during the relevant time.

230.     Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

231.     Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## V.    CAUSES OF ACTION

### COUNT I:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (DEFECTIVE DESIGN)

232.    Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 231 above, and further allege the following:

233.    Each Defendant, their predecessors-in-interest and/or their alter egos are and/or have been a manufacturer, distributor, supplier, retailer, wholesaler, and/or assembler of AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors.

234.    Each Defendants' AFFF/Component Products were manufactured for placement into the stream of commerce.

235.    As manufacturers, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiff, and not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

236.    By manufacturing and selling AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors, Defendants warranted that such AFFF/Component Products were merchantable, safe, and fit for ordinary purposes.

237.    Defendants breached that warranty because their AFFF/Component Products were unreasonably dangerous for their reasonably anticipated uses for the following reasons:

     a.    PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

     b.    Even at extremely low levels, PFAS render drinking water unfit for consumption;

     c.    PFAS poses significant threats to public health; and,

     d.    PFAS create real and potential environmental damage.

238.     Defendants knew of these risks and failed to use reasonable care in the design of their AFFF/Component Products.

239.     AFFF containing PFOS, PFOA, and/or their chemical precursors poses a greater danger to the environment than would be expected by ordinary persons such as Plaintiff and the general public.

240.     At all times, Defendants were capable of making AFFF/Component Products that did not contain PFOS, PFOA, and/or their chemical precursors.  Thus, reasonable alternative designs existed which were capable of preventing Plaintiff's damage.

241.     The risks posed by AFFF containing PFOS, PFOA, and/or their chemical precursors far outweigh the products' utility as a flame-control product.

242.     The likelihood that Defendants' AFFF/Component Products would be spilled, discharged, disposed of, or released onto land and contaminate Plaintiff's property and the Affected Areas and the gravity of that damage far outweighed any burden on Defendants to adopt an alternative design, and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

243.     Had Plaintiff known of these dangers, it would not have purchased AFFF containing PFOS, PFOA, and/or their chemical precursors or would have taken steps to ensure such products were used and disposed of differently to prevent potential exposure and contamination of the environment.

244.     Plaintiff relied on Defendants' implied warranty that their AFFF/Component Products were safe for use in outdoor fire emergencies and training exercises.

245.     As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/Component Products containing PFOS, PFOA, and/or their chemical

precursors, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring costs.

246.     Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

**COUNT II:**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(FAILURE TO WARN)**

247.     Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 246 above, and further allege the following:

248.     As a manufacturer of AFFF/Component Products containing PFOS, PFOA, and their chemical precursors, Defendants had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiff and the public.

249.     Defendants' AFFF/Component Products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

a.   PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

b.   Even at extremely low levels, PFAS render drinking water unfit for consumption;

c.   PFAS poses significant threats to public health; and

d.   PFAS create real and potential environmental damage.

250.    Defendants knew of the health and property damage risks associated with their AFFF/Component Products, and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have allowed Plaintiff to avoid the damage to its property.

251.    Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their AFFF/Component Products in the vicinity of drinking water supplies, including PFAS contamination of public drinking supplies and private wells, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/Component Products to Plaintiff, governmental agencies or the public.

252.    Plaintiff would have heeded legally adequate warnings and would not have purchased AFFF products containing PFOS, PFOA, and/or their chemical precursors, or would have taken steps to ensure such products were used and disposed of differently to prevent potential exposure and contamination of the environment.

253.    As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring.

254.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of drinking water supplies. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

255.    At all times material, the Defendants manufactured, designed, formulated, marketed, tested, promoted, supplied, sold, and/or distributed their AFFF/Component Products in

45

the regular course of business.  Defendants knew or should have known that PFAS exposure was hazardous to the environment and to human health.

## COUNT III:
### NEGLIGENCE

256.    Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 255 above, and further allege the following:

257.    As a manufacturer and seller of AFFF/Component Products, Defendants owed a duty to Plaintiff and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS-containing AFFF.

258.    Defendants owed a duty to Plaintiff to act reasonably and not place inherently dangerous AFFF/Component Products into the marketplace when its release into the drinking water supplies was imminent and certain.

259.    Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

260.    Defendants knew or should have known that PFAS were leaching from AFFF used for fire protection, training, and response activities and would contaminate water supplies.

261.    Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their AFFF/Component Products would result in the contamination of the drinking water supplies at airport facilities like MVY.

262.    Despite the fact that Defendants knew that PFAS are toxic, can contaminate water resources and are carcinogenic, Defendants negligently:

a.  designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/Component Products containing PFOS, PFOA, and/or their chemical precursors;

b.  issued deficient instructions on how their AFFF/Component Products should be used and disposed of, thereby permitting PFAS to contaminate the groundwater in and around MVY;

c.  failed to recall and/or warn the users of their AFFF/Component Products of the dangers of groundwater contamination as a result of standard use and disposal of their products; and

d.  failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/Component Products.

263.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiff was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

264.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/Component Products.

265.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered, and continues to suffer, property damage requiring investigation, remediation, and monitoring costs to be determined at trial.

266.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of drinking water supplies.  Defendants committed each of the above-described acts and omissions knowingly,

willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

## COUNT IV:
## TRESPASS

267.    Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 266 above, and further allege the following:

268.    Plaintiff is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water.

269.    Defendants designed, manufactured, distributed, marketed, and sold AFFF/Component Products with the actual knowledge and/or substantial certainty that AFFF containing PFOS, PFOA, and/or their chemical precursors would, through normal use, release PFAS that would migrate into groundwater, causing contamination.

270.    Defendants negligently, recklessly, and/or intentionally designed, manufactured, distributed, marketed, and sold AFFF/Component Products in a manner that caused PFAS to contaminate Plaintiff's property and the Affected Areas.

271.    As a direct and proximate result of Defendants' trespass, Plaintiff has suffered and continues to suffer property damage requiring investigation, remediation, and monitoring costs.

272.    Defendants knew that it was substantially certain that its acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiff's property rights.

## COUNT V:
## MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, ENTERPRISE LIABILITY

273.     Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 272 above, and further allege the following:

274.     Defendants in this action are manufacturers that control a substantial share of the market for AFFF/Component Products in the United States and are jointly responsible for the contamination of Plaintiff's and the Affected Areas' groundwater supply and for causing the damages and injuries complained of in this Complaint.

275.     Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/Component Products at issue in this Complaint.

276.     Because PFAS are fungible, it is impossible to identify the exact Defendant who manufactured any given AFFF/Component Product that contained the PFAS found free in the groundwater, and, each of these Defendants participated in a state-wide and national market for AFFF/Component Products during the relevant time.

277.     Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFAS.

278.     Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## COUNT VI:
## ACTUAL FRAUDULENT TRANSFER (DuPont and Chemours Co.)

279.    Plaintiff adopts, reallege and incorporate the allegations in paragraphs 1 through 278 above, and further allege the following:

280.    Through their effectuation of the Spinoff, Chemours Co. and DuPont (the "Fraudulent Transfer Defendants") caused Chemours Co. to transfer valuable assets to DuPont, including but not limited to the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

281.    The Transfers and Assumed Liabilities were made for the benefit of DuPont.

282.    At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

283.    The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

284.    Plaintiff has been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

285.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## COUNT VII:
## CONSTRUCTIVE FRAUDULENT TRANSFER (DuPont and Chemours Co.)

286.    Plaintiff adopts, realleges and incorporates the allegations in paragraphs 1 through 285 above, and further allege the following:

287.    Chemours Co. did not receive reasonably equivalent value from DuPont in exchange for the Transfers and Assumed Liabilities.

288.    Each of the Transfers and the assumption of the Assumed Liabilities by Chemours Co. was made to or for the benefit of DuPont.

289.    At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, DuPont was in a position to, and in fact did, control and dominate Chemours Co.

290.    The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours Co. was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

291.    Chemours Co. was insolvent or in contemplation of insolvency at the time of the Transfers, or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

292.    At the time that the Transfers were made and Chemours Co. assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed, that Chemours Co. would incur debts beyond its ability to pay as they became due.

293.    Plaintiff has been harmed as a result of the Transfers.

294.    Plaintiff is entitled to avoid the Transfers and to recover property or value transferred to DuPont.

## COUNT VIII:
## PUNITIVE DAMAGES

295.    Plaintiff adopts, realleges, and incorporates each and every allegation in paragraphs 1 through 294, and further alleges the following:

296.    Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing damage upon Plaintiff, disregarding their protected rights.

297.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate the drinking water supply of Plaintiff and the Affected Areas.

298.    Defendants have caused great harm to the water supplies of Plaintiff and the Affected Areas and demonstrated an outrageous conscious disregard for their rights and safety with implied malice, warranting the imposition of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, MARTHA'S VINEYARD AIRPORT COMMISSION, demands judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

    a.    Compensatory damages according to proof including, but not limited to:

        (1) costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination at MVY and the Affected Areas;

        (2) costs and expenses related to past, present, and future treatment and remediation of PFAS contamination at MVY and the Affected Areas;

        (3) costs and expenses related to past, present, and future installation and maintenance of filtration systems to assess and evaluate PFAS at MVY and the Affected Areas;

    b.    an order barring the transfer of DuPont's liabilities for the claims brought in this Complaint;

    c.    an award of punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future;

    d.    an award of consequential damages;

e. an order for an award of attorney fees and costs, as provided by law;

f. an award of pre-judgment and post-judgment interest as provided by law; and

g. an order for all such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, MARTHA'S VINEYARD AIRPORT COMMISSION, demands a trial by jury of all issues so triable as a matter of right.

DATED this 5th day of May, 2020.

Respectfully submitted,

**THE FERRARO LAW FIRM**

*/s/ James L. Ferraro*
James L. Ferraro, Esq. (**Mass. B.B.O No.**: 545465)
James L. Ferraro, Jr., Esq. (FL. Bar No.: 107494)
Janpaul Portal, Esq. (FL. Bar No.: 0567264)
600 Brickell Avenue, 38th Floor
Miami, Florida 33131
Telephone (305) 375-0111
jlf@ferrarolaw.com
jjr@ferrarolaw.com
jpp@ferrarolaw.com

-and-

**NAPOLI SHKOLNIK, PLLC**

*/s/ Andrew W. Croner*
Paul J. Napoli, Esq.
Andrew W. Croner, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
pnapoli@nsprlaw.com
acroner@napolilaw.com